---

(99 App. Div. 334)

In re WOOD et al.

(Supreme Court, Appellate Division, First Department. December 23, 1904.)

1. RAILROADS—CONSTRUCTION—CERTIFICATE BY BOARD OF RAILROAD COMMISSIONERS—PUBLIC CONVENIENCE—ELEMENTS FOR CONSIDERATION.

Under Railroad Law (Laws 1892, p. 1395, c. 676) § 59, providing that no railroad corporation shall exercise the powers conferred on it or begin the construction of its road until the Board of Railroad Commissioners shall certify that the public convenience requires the construction of the proposed road, the board, in determining an application by a railroad corporation for a certificate for the construction of a proposed road, cannot take into consideration the fact that another corporation has a franchise to construct a road in the territory involved, where the conditions of the franchise are so burdensome as to render the building of a road under it improbable, but can only consider the facilities for transportation afforded by an existing line.

2. SAME.

It is error for the Board of Railroad Commissioners to refuse to issue a certificate that public convenience requires a proposed railroad merely because it is parallel to the line of another corporation, when, in view of the topography of the country, the proposed road will serve a district which the existing line cannot reach.

3. SAME.

The Board of Railroad Commissioners, in determining whether public convenience requires the construction of a proposed railroad, must take

91 N.Y.S.—15

into consideration the future growth of population in the territory involved, together with the fact that the local authorities have consented to its construction.

**4. SAME.**

It is proper for the Board of Railroad Commissioners to refuse to issue a certificate that public convenience requires the construction of a proposed railroad parallel to an existing line of road which can afford all the facilities needed for the territory involved.

**5. CORPORATIONS—PAYMENT OF STOCK IN CASH—SUFFICIENCY.**

Ten per cent. of the capital stock of a railroad company was deposited with a bank to the credit of the company, subject to be drawn out only on checks signed by the officers of the company. The bank in which the deposit was made was interested in the company, but was absolutely responsible. *Held* a compliance with the statute requiring the payment in cash of at least 10 per cent. of the capital stock of a company as a condition precedent to a valid incorporation.

Hatch and Laughlin, JJ., dissenting.

Application by Robert C. Wood and others, directors of the New York City Interborough Railway Company, for an order directing the Railroad Commissioners to grant a certificate that the public convenience requires the construction of railroads proposed by the company. Granted in part, and refused in part.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

George W. Wickersham, for applicants.
Paul D. Cravath, for Union Ry. Co.
W. H. Page, Jr., for People's Traction Co.

PATTERSON, J. This application is made pursuant to the provisions of section 59 of the railroad law (Laws 1892, p. 1395, c. 676), which relates to the granting by the board of Railroad Commissioners of certificates of public convenience and necessity before a railroad corporation formed under the laws of the state shall exercise the powers conferred by law upon such corporation or begin the construction of its road. The act in question provides that in case of a refusal of the Railroad Commissioners to grant such certificate, after such refusal the board shall certify a copy of all maps and papers on file in its office and of the findings of the board, when so requested by the directors of the applying corporation; and that such directors may thereupon present the same to a General Term of the Supreme Court of the department within which such railroad is proposed to be constructed in whole or in part, and such General Term shall have power, in its discretion, to order such board, for reasons stated, to issue such certificate, and it shall be issued accordingly. It has been held in several of the departments of this state that the application to the General Term (or, as it now is, the Appellate Division) is in the nature of an appeal from the determination of the Railroad Commissioners. In view of the language of the section it may very well be doubted if that construction is correct, or expresses what was intended by the Legislature. It is to be observed that all that is required to be certified to the Appellate Division is a copy of all maps and papers on file in its office and of the findings of the board. There is nothing which re-

quires a return of the testimony taken by the board; and, further, the Appellate Division is to act in its discretion, and is not confined to disposing of legal questions or ruling upon legal errors committed by the board. In view of the absence of any direction to certify the evidence taken before the commissioners, it may well have been intended that the Appellate Division should take evidence for itself, and then pass upon the question in its discretion, and determine whether a certificate should be issued or not. Where appellate jurisdiction only is to be exercised, it has never been provided that the court, in its discretion, might reverse the action of the lower tribunal. It may not, perhaps, be necessary to determine that question on this application, as the parties have assumed in its presentation that the evidence ought to be certified, as well as the maps and papers on file in the office of the Board of Railroad Commissioners, and have chosen to submit the application upon that evidence.

In the consideration of the application upon its merits it is proper, in the first instance, to examine the grounds upon which the Railroad Commissioners denied it. In the opinion of the majority of the board, and as a ground for the refusal to grant the certificate applied for, it is stated that after careful consideration of the evidence the board concluded that public convenience and necessity "do not require the construction of this railroad." They also say that it was proposed to construct it in a territory now served by the Union Railway (a street surface electric line), and it seemed to them that there is little, if any, traffic which would be carried by the applicant which is not now carried by the Union Company, or cannot be carried upon the lines which the Union Company and its affiliated company (the People's Traction Company, not constructed) have franchises to construct. It will thus be seen that the decision of the Railroad Commissioners is based upon a service that can be afforded by the construction in the future by the People's Traction Company of a railroad for which it has a franchise. An examination of the record before us discloses that under the conditions on which that company holds its franchise there is no probability of its ever constructing any part of its railway. It has agreed to pay a proportion of its gross receipts as a condition of procuring its franchise which is absolutely prohibitive, and it seems strange that the board should have based a judgment upon the illusory and almost impossible prospect of the People's Traction Company to construct. This erroneous view seems to have pervaded all of the findings of the commissioners, as they are careful in every part of their decision to base it, among other things, upon the right to construct possessed by the People's Traction Company. This application must then be considered with respect to the lines which the Union Railway Company has constructed, and by which facilities of transportation are afforded to the residents of the locality under consideration.

The objection to the application which has been urged by the Union Railway Company is that the routes proposed by the applicant parallel to a very large extent the routes of the Union Railway Company, and pass through a territory transportation facilities

in which are furnished by said company. While this criticism may be true in regard to two of the routes mentioned in the application, yet as to the others it will be seen on examination and comparison of the routes that facilities will be afforded for the transportation of passengers from the east to the west, and vice versa, which are in no way afforded by the lines of the Union Railway Company; and that in respect to one of the routes, which upon the map appears to parallel that of the Union Company, yet, in view of its topographical configuration, it serves a district which the Union Railway Company cannot reach. In regard to others of the routes facilities are afforded for the crossing of the district in question which are not, and cannot be, provided by the Union Railway Company.

It seems to us further that the Board of Railroad Commissioners have failed to appreciate the growth of population within the limits of the district involved. The completion of the subway will undoubtedly bring large numbers of inhabitants to the locality; and, if they can be afforded facilities from getting from intermediate points to the stations of the subway and the elevated railway, unquestionably the increase will be very greatly augmented. In considering this application, moreover, we must bear in mind that the local interests and authorities, after a full investigation as to the public necessity and requirements, have given their consent to the construction of these railroads. It is also to be observed that a large number of the officials residing within the district, many of the various associations formed for the improvement of the district, and representative citizens from all parts of this territory came forward and gave their evidence in favor of the applicants, and the reason why this additional transportation facility should be afforded. These witnesses testified to the inadequacy of the existing transportation facilities even for present needs, not to speak of the requirements for carrying and distributing the great increase of population in the borough which will undoubtedly take place. It seems to us, therefore, that it was the duty of the Railroad Commissioners, except in those instances where there was a direct parallel route with the Union Railway Company, to grant to the applicant the right to build the lines of road applied for, and thereby afford those additional facilities which the evidence clearly shows the borough is entitled to.

We think, however, that the board was justified at the time in refusing its consent to the building of the fifth and eighth routes. Those routes parallel the lines of the Union Railway Company to a very considerable extent; and the Union Railway Company can, if it will, afford all the facilities needed for the territory which would be reached by these proposed routes of the applicant company.

It was objected before us that the applicant's certificate of incorporation is void, because it affirmatively appears from the evidence that at the time of the filing of the said certificate 10 per cent. of the capital stock had neither been subscribed nor paid for in good faith and in cash in the manner prescribed by law. It is to be noticed that the Board of Railroad Commissioners appear to have

overruled this objection. They have found that the applicant was duly incorporated, and that it had received a franchise from the local authorities for the construction of its line, and therefore must have passed upon this subject. It, however, becomes appropriate for us to consider whether there was a compliance with the statute in respect to the payment of 10 per cent. of the capital stock in good faith and in cash. The main objection raised to the legality of the incorporation of the applicant is that the depository of the 10 per cent., upon which it was paying interest, did not keep the whole of the deposit as a separate sum on hand all the time. It is a familiar principle relating to the deposits of money with a bank or banker that the relation of debtor and creditor is created, and that the depositor has no right to demand the identical money which he deposited with his bank or banker. It is also a well-known principle of banking that, where customers make a deposit with banks or bankers, those banks or bankers have the right to use those deposits in their business, and they fulfill their contracts with their depositors when they honor the drafts which may be drawn upon them. It would be peculiar if the bank or banker, when money is deposited upon which interest is paid, could not use the money in business. If that were so, it would be difficult to see how the fund for the payment of interest would be created. As we read the evidence in this case, that is the sole question presented concerning the payment of the 10 per cent. of the capital stock of the applicant. It was deposited with the bankers to the credit of the Interborough Railway Company, and could be drawn out only upon checks signed by the officers of the company. It is true that the bankers with whom the deposit was made were interested in the railway company, but there is not a suggestion but that they were absolutely responsible, nor an intimation that there was the slightest danger of the money being lost. If this application is to be considered as an appeal by the applicant company, there was certainly evidence enough before the Board of Railroad Commissioners to show that the money was paid in in good faith. They have so found, and there is no reason whatever why their finding in that regard should be reversed, or even questioned.

We think, therefore, that the application should be granted so far as to direct the issuance by the Railroad Commissioners of a certificate as to the first, second, third, fourth, sixth, and seventh routes, but not as to the fifth and eighth routes.

VAN BRUNT, P. J., and O'BRIEN, J., concur.

HATCH, J. (dissenting). The first question we have to deal with upon this application involves a consideration of the legal existence of the corporation making the application for the certificate. The applicant, called for convenience the Interborough Company, claims to have been organized in March, 1902, for the purpose, as stated in its certificate of incorporation, of constructing and operating a new system of surface railroad lines, which, with the exception of short extensions over Harlem river bridges, are located en-

tirely within the borough of the Bronx. After its incorporation it applied to the local authorities for their consent to the construction and operation of the railroads described in the certificate of incorporation, and such consent to the greater part of its proposed lines was granted in the form of an ordinance passed by the board of aldermen and approved by the mayor. Thereupon the Interborough Company applied to the Board of Railroad Commissioners, under section 59 of the railroad law, for a certificate that the public convenience and necessity required the construction of such railroad. The application was withdrawn as to certain small portions of the road embraced within the franchise granted by the local authorities, and the railroad routes which are the subject of discussion upon this application are such of the routes as were originally described in the certificate of incorporation of the Interborough Company and were embraced in its application to the board. Section 2 of the railroad law (chapter 565, p. 1082, Laws 1890, as amended by chapter 676, p. 1383, Laws 1892) provides for executing, acknowledging, and filing a certificate. Subdivision 13 of this section, among other things, provides:

"Such certificate shall have endorsed thereon, to be taken as a part thereof, an affidavit of at least three of such directors, that at least ten percent of the minimum amount of capital stock authorized by law has been subscribed thereto, and paid in in good faith in cash to the directors named in the certificate, and that it is intended in good faith to build, maintain and operate the road mentioned therein. * * * The filing of every certificate, where the amount of stock required by this section has not been in good faith subscribed and paid in cash, shall be void."

In Matter of Kings, Queens & Suffolk R. R. Co., 6 App. Div. 241, 39 N. Y. Supp. 1004, it was said in construction of the above-quoted provision:

"The penalty which the law prescribes for a failure to pay at least ten per cent. of the subscriptions to the capital stock in cash is to render the filing of any certificate void. * * * There is no qualification in favor of an inadvertent act, and no saving clause for failure, however occasioned. The requirement is imperative; the penalty absolute. * * * The law is that the petitioner must have regularly complied with the statute at the time it makes application to the board for the certificate of public convenience and necessity. * * * The board is only authorized to act where there has been compliance with the law, and the whole proceeding, until final authority is given to construct a railroad, is tentative only. * * * It is not only within the province of the board, but it is its duty, to make inquiry into all prior proceedings, in order to determine that the thing which applies for the certificate of public convenience and necessity is of a character which the law recognizes, and to which it contemplated that a certificate should be given. * * * It is at that time subject to inspection for the very purpose of determining whether it exists as a legal body, and for the further purpose of considering whether, its legality being established, it ought to be permitted to do the things which it was organized to do. But, however it be treated, the statute made its certificate of incorporation void" unless the 10 per cent. had been paid in in good faith in cash.

In analogous cases a similar rule has been applied. Thus, in the case of an assignment for the benefit of creditors, where the statute requires that the assignor should make and acknowledge the instrument before title to the property would become vested in the as-

signee, failure so to do was held to render it ineffectual; the court stating in respect thereto:

"It is a maxim of the law that if an affirmative statute, which is introductive of a new law, direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner." Hardmann v. Bowen, 39 N. Y. 196.

And a similar rule was applied to the case of a special partnership, where the requirement was to pay in in cash the amount of the special partner's contribution, and it was held that compliance was not had with such statute by payment of anything else except cash, and assets attempted to be substituted therefor, even though they were convertible at the time into money did not answer the requirement of the statute; that whether the act was intentional or unintentional was of no consequence, as the statute avoided the effect of the contribution, unless absolute compliance with it was made. The statute is self-operating, and needs no action to be taken in order to render the certificate void. Brooklyn S. T. Co. v. City of Brooklyn, 78 N. Y. 524. In the light of this rule of law we are called upon to make inquiry into the evidence which it is claimed shows compliance with this provision of the statute. The capital stock of the corporation was $400,000, divided into 4,000 shares; and subscription was made for all of the capital stock. 1,800 shares were subscribed for by Mr. Wood; 1,800 by Mr. Scoville; 100 by Mr. Fransciolo, the engineer of the company; and 140 shares were subscribed for by the employés of the firm of Wood, Havemeyer & Kearney and by Mr. Brady. It appears, therefore, that nearly one-half of the stock was subscribed for by the members of the firm of Wood, Havemeyer & Kearney. On March 21 and 22, 1902, the certificate of incorporation was acknowledged, and on March 24, 1902, the affidavit of the payment of the 10 per cent. was verified, and the papers were filed in the office of the Secretary of State and with the county clerk of the county of New York, respectively. On March 24, 1902, a meeting of the subscribers and incorporators was held in the office of Wood, Havemeyer & Kearney, at which were present Wood, Fransciolo, Kearney, Pinckney, Marston, and Bryant (the last three being employés of the Wood firm), and E. G. Whitaker, counsel. The minutes of the meeting recited that Wood received from the incorporators and subscribers the sum of $40,000, being 10 per cent. of the entire capital stock, which he thereupon paid over to the directors on behalf of the incorporators and subscribers, and it was directed "that the same be held by Mr. R. C. Wood and Mr. Philip Kearney, as trustees for the board of directors, until further directed by said board after its organization." The meeting then adjourned. At a meeting of the board of directors of the corporation held April 17, 1902, there were present the above-named individuals, and in addition thereto Mr. Scoville and Mr. Weeks. At this meeting Scoville moved a resolution in substance providing that the $40,000 which was deposited with Wood and Kearney as trustees for the corporation be placed in the hands of the treasurer of the Interborough Company, and that said treasurer be empowered to place the money on deposit

with Wood, Havemeyer & Kearney, who are designated as the depositaries of the Interborough Company. This resolution was carried unanimously, and the minutes further recited that Mr. Wood and Mr. Kearney, as trustees for the Interborough Company, thereupon paid to the treasurer said sum of $40,000 pursuant to the resolution. The meeting thereupon adjourned. Wood was the president of the company, Kearney its treasurer, and Pinckney, an employé, was the secretary. The subscription to the capital stock by Marston, Bryant, and Pinckney, employés and directors, was of 10 shares each, for which they never paid anything, and for which and for whom Wood agreed to pay. They only had the certificates of stock in their possession long enough to indorse them over to Wood, who thereafter retained possession of them. So far as these subscribers were concerned, they were entirely under the control of Wood, Havemeyer & Kearney, and acted in everything which they did as directed by Wood, and it is evident that they never expected to take and pay for the stock for which they thus subscribed. At the meeting on March 24th, Wood produced before the board of directors forty $1,000 bills, which he testified had been advanced by the firm of Wood, Havemeyer & Kearney for the purpose of paying 10 per cent: of the stock subscription. This money had immediately prior to its production before the board been drawn from the bank account of Wood, Havemeyer & Kearney from the bank in which they kept their general account. This firm was a firm of stockbrokers, and were denominated bankers and brokers. They were not a bank of deposit, but kept their bank account with the Manhattan Company, although it appeared that in the course of their business money was sometimes left with them upon deposit. At the board meeting the $40,000 remained in the hands of Wood, and he took it with him at the conclusion thereof, delivered it to his bookkeeper, with directions to open an account with the Interborough Company and the firm; but immediately thereafter he deposited the whole sum in the National Bank of North America to the credit of himself and Kearney as trustees. On the same day a check of Wood & Kearney, as trustees, for $19,500 of this deposit, was drawn, and the same was deposited to the credit of Wood, Havemeyer & Kearney in the Manhattan Company, and went into their general account. Upon the next day—March 25th—a like check was drawn by Wood and Kearney, as trustees, for $20,000, to the order of Wood, Havemeyer & Kearney, which in like manner was deposited with the Manhattan Company to the credit of the general account of the firm, and the firm gave a credit to the Interborough Company upon the books of the firm for $39,500. Evidence was sought to be elicited from the witness as to the disposition made of the other $500, but this line of inquiry was excluded by the commissioners, and it was not made to appear. The money thus drawn out and deposited with the Manhattan Company was used by the firm of Wood, Havemeyer & Kearney in the course of their general business without any distinction as to the character of the funds. Wood understood the nature of the transaction, for he testified that, had the firm failed after the deposit had been drawn

out of the North American Bank and placed in their general account with the Manhattan Company, the Interborough Company would have had only a right in such fund as a general creditor. Whether he was right in this view as a legal conclusion is not of consequence. It is only important as bearing upon the relation which he then understood he and Kearney bore to the Interborough Company, and as to that, in his mind, the trusteeship had grown exceedingly dim. It further appeared that the general balance of the account which the firm of Wood, Havemeyer & Kearney carried with the Manhattan Company was $15,000, even after the deposit of $39,500 was made. Counsel for the railroad company, opposing the granting of the certificate, attempted a line of inquiry by which he sought to develop the disposition which was made by the firm of this sum of money after it was so deposited, and also sought to develop where the $40,000 had originally come from which Wood produced before the board of directors. The commissioners, however, refused to permit such line of inquiry, based upon the theory that it was an inquiry into the private business of the firm, and was not germane to the question. In this the commissioners committed a very serious error, as it was clearly competent to enter upon the fullest investigation with respect to where the $40,000 came from and where it went; for, if the average balance of the bank account of the brokerage firm with the Manhattan Company was only about $15,000, it would have been interesting to have learned by what process it was increased to $40,000, and equally interesting to know by what process it was reduced back again to $15,000 after the deposit of the $39,500. By reason of the ruling, however, these pertinent matters do not appear. It does appear, however, that within 24 hours after the payment of the 10 per cent. of subscription of the capital stock in cash it had served the purpose of complying with the statute, and had, by the action of persons largely under the control of the firm, and who did not contribute a dollar, been directed to be deposited with Wood and Kearney, as trustees, with the firm, which was accomplished by a bookkeeping entry which credited the Interborough Company with the amount of this sum; but, instead of remaining in the trust account, it made a complete circuit, landing in the general account of this firm in the Manhattan Company, from whence it came the day before, and from which it apparently vanished in the course of the general business of that firm. There were many other pertinent subjects of inquiry in respect of all these matters which were shut out from investigation by the commissioners under the objection of the applicant for the certificate. There should have been no limit upon this inquiry until the entire transaction was laid bare. Enough, however, appears to show that this proceeding did not constitute a compliance with the statute. The law does not look at the form of the transaction, which was fair enough upon the face of the minutes of the two meetings, but it looks at the substance, and, so looking, it fails to find any money to the credit of the Interborough Company after Wood, Havemeyer & Kearney had finished with their manipulation of it. It then clearly appeared that the only thing which the Inter-

borough Company had was the credit of Wood, Havemeyer & Kearney upon their books. Not a cent of money was in their hands which belonged to the railroad company. Not a penny was on deposit anywhere with Wood and Kearney as trustees, save possibly the $500 in the Bank of North America, the disposition of which was not made to appear by reason of the objection of the applicant. It does not answer for the applicant to say that money was in fact expended to the extent of twenty-seven thousand odd dollars for the legitimate purposes of the Interborough Company, for which it claimed to hold vouchers. They were sedulously excluded from examination by their adversaries, and only the commissioners were allowed a private inspection when in executive session; at least such proffers were made. They were admissible for every purpose, were proper to be considered, and should have been exhibited in the public light, in order that the opponents to the granting of the certificates might know of the case that was being made, and it was absolutely essential that they should so appear in order that this court might have before it the same case which the commissioners had by private or public hearing. As it now remains, this court has no more information upon the subject of the vouchers than had the attorneys for the opposing railroad companies, and therefore we are unable to say from them that the Interborough Company had the benefit of any of the credit which Wood, Havemeyer & Kearney gave it outside of the oral testimony. But, aside from these considerations, the transaction is scarcely concealed. The evident purpose was to make compliance with the statute by producing the money, and reciting such fact in the minutes of the board, and then make disposition of the same so that the firm of Wood, Havemeyer & Kearney were not for a single instant out of the beneficial enjoyment of the entire sum; and they either paid debts which they had contracted, or they used it in their business, and mingled it with their other funds. This transaction, therefore, was a mere evasion of this statute. It did not constitute a bona fide payment in good faith of 10 per cent. of the stock subscriptions, and a statement in the affidavit attached to the certificate as filed and the recitals in the minutes kept by the board of directors, which this firm evidently controlled, does not make it so. It is plain that there was only an apparent attempt to comply with this provision of law, and, as it was not done in good faith, but for the purpose of evading the terms of the statute, it rendered the certificate void, and there was at no time an existing railroad corporation which was entitled to a certificate of public convenience and necessity from the Board of Railroad Commissioners.

In Matter of Kings, Queens & Suffolk R. R. Co., supra, the omission to make the payment was inadvertent, although the stock subscriptions had in fact been paid in in actual cash at the time of the hearing to the amount of $60,000, and a check for $3,750, which was 10 per cent. of the stock subscription, was offered to be certified by the bank where the money was deposited, as good, and yet the court held that the statute had not been complied with, and that, therefore, the certificate was void. In analogous cases such trans-

action as has been developed by the evidence has been condemned. President, etc., of Manhattan Co. v. Phillips, 109 N. Y. 383, 17 N. E. 129; Met. Nat. Bank of N. Y. v. Sirret, 97 N. Y. 320. While the affidavit and the recital, standing alone, would be sufficient to show payment in good faith (Buffalo & Pittsburgh R. R. Co. v. Hatch, 20 N. Y. 157), it is not conducive; and where the whole transaction is stated, and, as here, practically undisputed, the payment must be regarded as an evasion of the statute, and renders the certificate void. The Board of Railroad Commissioners apparently did not pass upon this question, but it is clearly within this case, and conclusive of it.

Aside from this question, we are of opinion that the evidence adduced before the Board of Railroad Commissioners justified the conclusion which the majority reached. The rule which governs a review of the action of the board is settled by decisive authority, so far as the Supreme Court is concerned. It was said by Cullen, J., in Matter of New Hamburgh R. R. Co., 76 Hun, 76, 27 N. Y. Supp. 664, in speaking of the consideration required to be given to a review of proceedings of this character:

"This mode of proceeding, while it grants the court power to review the action of the commissioners, plainly indicates that the court is to treat the application as in the nature of a review of the decision of a subordinate tribunal, and not as it would an original application made to it in the first instance. The burden rests upon the petitioner to show affirmatively that the commissioners erred in their determination, and the commissioners should be credited with some technical knowledge which this court is not presumed to possess."

In Matter of Amsterdam, J. & G. R. R. Co., 86 Hun, 578, 33 N. Y. Supp. 1009, Herrick, J., quoted with approval the rule above stated, and added:

"I concur with that view of the province of this court in these proceedings. Unless the court can see that the decision of the Board of Railroad Commissioners was founded upon erroneous legal principles, or that it proceeded contrary to the clear weight of evidence in arriving at its conclusion upon any question of fact, or that it has abused the discretion vested in it, and has arbitrarily refused to issue the necessary certificate, I do not think that the court should reverse its determination and compel it to issue a certificate."

The same rule was announced in Matter of Depew & Southwestern R. R. Co., 92 Hun, 406, 36 N. Y. Supp. 991, in the Fourth Department, in an opinion delivered by Bradley, J., and was reiterated by the Appellate Division in Matter of Auburn & Western R. Co., 37 App. Div. 162, 55 N. Y. Supp. 895, and by the Appellate Division in the Second Department in Matter of Kings, Queens & Suffolk R. R. Co., supra. Applying this rule to the evidence as it was developed in this case, we think that the conclusion reached by the majority of the commissioners finds abundant justification. If we were examining this case as an original question upon the merits, we should reach the conclusion that the application was properly denied. The policy of the Legislature with respect to authorizing the construction of a new railroad in territory where a railroad already exists and is being operated has been steadily progressive. In the beginning, consent to the construction was only

required from owners of property through which the proposed road
was to run and from local authorities granting the right. In prac-
tical operation many franchises were obtained for the construction
of railroads which the promoters and persons obtaining the grant
never intended to construct, but to acquire and hold the same for
purposes of speculation. The abuses in this regard prompted the
Legislature from time to time to pass laws regulating and control-
ling the subject, and the granting of a franchise to construct a road
under the present law is made subject not alone to the consent of
property owners and local authorities, but the Board of Railroad
Commissioners are vested with control, subject to review by the
courts, as to whether the public convenience and a necessity re-
quire the construction of the line. Such authority is now found ex-
pressed in section 59 of the railroad law. In practical administra-
tion of this power the Railroad Commissioners are called upon to
consider and protect vested interests against reckless or unfair com-
petition produced by the construction of new lines, the paralleling
of existing lines, and to protect invested interests in railroad prop-
erty against the attacks of promoters, who, in the main, are largely
actuated in forcing existing railroads to pay tribute in order to pro-
tect its property. No railroad should now be permitted to be con-
structed in a territory where one already exists which is reasonably
supplying existing needs, or which, by extensions, may meet the
demands of the general public. When such a condition exists, pub-
lic convenience and a necessity do not require added lines of road.
Such are the principles which have been acted upon by the Railroad
Commissioners, and which have been expressed by the courts when-
ever the question has arisen. Matter of Empire City Traction Co.,
4 App. Div. 103, 38 N. Y. Supp. 983; People ex rel. Steward v. R.
R. Commissioners, 160 N. Y. 202, 54 N. E. 697; Matter of Amster-
dam, J. & G. R. R. Co., supra; Matter of Auburn & Western R.
Co., supra. There may be added to these general considerations a
further suggestion that it is also the policy of the law with respect
to street surface railroads that, so far as possible, in large cities and
towns the railroads existing therein shall by a system of transfers
transport passengers between all points over the lines operated by a
single company for a single fare, and to make that fare as low as is
permissible and make fair return upon the money invested in the
enterprise. Competing lines of railroad under different corpora-
tions and antagonistic administrations, instead of promoting, oper-
ate to defeat, this policy of the law. Nor do separate corporations
so operating produce what has been termed a "healthy competi-
tion." Public utilities of this character rarely do when so utilized.
The uniform history has been that, where one line of railroad
already in existence is permitted to be paralleled by another line of
railroad under antagonistic management, is first to produce a ruin-
ous competition, then to force consolidation of conflicting interests,
or, one not being able to survive, is driven into bankruptcy, and
absorbed by the other, unless restrained by law. "Healthy compe-
tition" becomes represented in the survivor, and it proceeds to force
out of the public the greatest possible revenue. The result is to

compel the public to pay interest upon capital invested in the unnecessary line, and thereby a burden becomes fastened upon it, which, if the construction had never been authorized, would have ultimately promoted a reduction in the price of carriage. It is evident, therefore, that where it appears that the line of railroad already existing does, or may by proper extensions, fairly serve the public need, a new line is not justified upon any theory. The argument that has been addressed to us that it does not lie in the mouth of the remonstrants to object to such construction when the applicants are willing to take the chances of a fair return upon their investment is utterly unsound, and should not prevail. It ignores vested rights, and, what is of more importance, it ignores the rights of the public that are interested in obtaining not only the most convenient, but the cheapest, transportation possible. These applicants are not engaged in a philanthropic enterprise, and ultimately expect that from some source there will be an abundant return from their investment. This return can only come from one of two sources—either by forcing the existing railroad to some terms, which always operates as a surrender of a part of its rights, or the burden becomes imposed upon the public, and they make the payment. In either case the public is always the one that ultimately finds itself between the upper and nether millstone of the two enterprises. The railroad already constructed is subject, in its charter rights, to legislative control, and it has become, after much trial and tribulation, the policy of the law to compel existing corporations to supply the reasonable needs of the traveling public by operation and extension of its own lines, rather than to permit the building of competitive railroads, which only operate in the end as a burden upon the public, without making adequate return, either in convenience or in cheapness of transportation. In view of these considerations, which have been sanctioned by the courts and by experience, it appears from the undisputed testimony in this case that the construction of this railroad is not justified by public convenience or a necessity. The routes which it proposes to construct approximately aggregate 36 miles of double track, 8 in number. The granting of the certificate for the construction was opposed by the Union Railway Company of New York, operating surface lines of electric railways in the borough of the Bronx, and by the People's Traction Company, which already holds a franchise for construction in this territory, but whose lines have not yet been constructed. The Union Railway Company owns or controls or operates practically all the existing surface railway lines in the borough of the Bronx, and also controls operating corporations of practically all the surface lines in the adjoining portion of Westchester county as far as Tarrytown, White Plains, and New Rochelle. It is also allied with the lessee of the Metropolitan Street Railway system, which operates all of the surface lines upon Manhattan Island. The lines of railway which the Union Company operate aggregate 78.48 miles, nearly all of which are double-track lines, and 88.18 miles in Westchester county. In the borough of the Bronx they are all operated under one system by means of transfers, and nearly

all of them are under the same transfer system in Westchester county. The same territory is also intersected by various branches of railroad under the control of and operated by the New York Central Railroad Company. The Third Avenue Elevated Railroad also runs into a part of this section, and the People's Traction Company, also affiliated with the Union Railway Company, has franchises for the construction of many additional miles of street railways. The maps introduced in evidence, conceded to be correct, show that the applicant railroad purposes for a large proportion of its construction to parallel already existing lines of the Union Company, and so close thereto that its patronage would be practically drawn from the same territory. The most striking illustration of parallelism is in route designated upon the map as "No. 8m," where the applicant road is to be laid along Railroad avenue, and for over 4 miles it runs within 900 feet of lines operated by the Union Company. Route No. 5 is almost the same. It commences at the Willis Avenue Bridge, runs thence in a northerly direction for nearly 4 miles within 900 feet of the Union Line, and for quite a considerable distance within 400 feet. Its route on Aqueduct avenue, which is next to the longest of the proposed construction, parallels the whole of the Union Line located on Sedgwick and Jerome avenues, and the greater portion of the way is within 400 feet. The following table is most instructive upon this subject:

|  | Total Length of Route in Feet. | Length Over 900 Feet from Union Lines. | Length Under 900 Feet from Union Lines. | Length Over 900 Feet from Lines Operated by Union Ry. | Length Under 900 Feet from Lines Operated by Union Ry. |
|---|---|---|---|---|---|
| Route No. 1 | 27,395 | 6,680 | 20,715 | 11,380 | 16,015 |
| " 2 | 15,206 | 5,660 | 9,546 | 6,360 | 8,846 |
| " 3W | 23,464 | 5,250 | 18,214 | 9,139 | 14,325 |
| " 3E | 24,720 | 17,200 | 7,520 | 20,800 | 3,920 |
| " 4 | 2,800 | 964 | 1,836 | 964 | 1,836 |
| " 5 | 28,400 | 5,045 | 23,355 | 5,045 | 23,355 |
| " 6 | 19,950 | 7,570 | 12,380 | 9,870 | 10,080 |
| " 7 | 11,280 | 7,600 | 3,680 | 7,600 | 3,680 |
| " 8 | 21,250 |  | 21,250 |  | 21,250 |
| Total | 174,465 or 33.04 Miles | 55,969 or 10.6 Miles | 118,496 or 22.44 Miles | 71,158 or 13.47 Miles | 103,307 or 19.57 Miles |
| Totals of Sections W. of Bronx River | 28.36 Miles | 7.32 Miles | 21.04 Miles | 9.54 Miles | 18.82 Miles |

—As it shows in detail the extent of the paralleling. In addition to this, it appears that the Union Railroad has never paid any dividends upon its stock, and that the business which it has been able

to do has only been sufficient to pay interest upon its outstanding obligations, meet running expenses and fixed charges. The surplus only amounted for the fiscal year ending June 30, 1903, to $24,308. Its capital is $2,000,000; 5 per cent. first mortgage bonds $2,000,000, and the floating debt $5,390,867.04; aggregating $9,390,867.04. It is evident, therefore, that to authorize the paralleling of its lines of road would so seriously impair its earning power as in all human probability to cause it to default upon the payment of its fixed charges and obligations. In any view, therefore, of the case, as thus made, it is evident that the views of a majority of the Railroad Commissioners were correct, and that a public convenience and necessity did not exist in the allowance of this application, and that to have granted it would seriously affect, if it did not produce the bankruptcy of, the Union Railway Company.

It follows, therefore, that the determination of the Railroad Commissioners should be sustained, and the application be denied, with costs.

LAUGHLIN, J., concurs.